UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOSEPH SAAD,

    Defendant.

CRIMINAL NO. 16-cr-20197

HON. DENISE PAGE HOOD
CHIEF U.S. DISTRICT JUDGE

**RESPONSE BY THE UNITED STATES IN OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE REDUCTION OF SENTENCE**

The prisoner, Joseph Saad, pled guilty before this court to aiding and abetting the unlawful distribution of the prescription controlled substance hydrocodone, in violation of 21 U.S.C. § 841(a)(1). As this court noted at sentencing, the defendant operated a "pill mill" that put 1.4 million dosage units of controlled substances into the community. (R. 38: Sentencing Tr., PgID 319-320) As the owner of not one but two different clinics, the defendant hired complicit doctors, including the elderly Dr. Lutwin, to write unlawful prescriptions so Joseph Saad

could profit.  Mr. Saad was the most culpable person in this case.  See generally R. 25, Government's Sentencing Memorandum.

His sentencing guideline calculation was initially 210-262 months, reflecting the seriousness of the large-scale pill mill operations he conducted.  (R. 38: Sentencing TR, PgID 319-320)  His sentence was limited to 120 months by the plea agreement.  This court exercised considerable leniency in sentencing Mr. Saad to 72 months of imprisonment, far below the minimum of 210 months suggested for the most culpable person in a 1.4 million dosage "pill mill."  The defendant's age and medical conditions were specifically referenced in both the court's sentencing remarks and the judgment.  This court was well aware of his medical conditions in imposing its sentence of 72 months.

Mr. Saad was sentenced on June 22, 2017.  The undersigned does not know the exact date he began to serve his sentence, but it is typically within a month or two after sentence is imposed.  This means the defendant has served approximately 33 months in custody.  The defendant wants his sentence reduced to time served.  This extreme remedy is unsuputtory by the medical record or the statutory

requirement that a sentence reflect the "seriousness of the offense" and "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A).

The defendant's argument is based on three sets of medical issues. The medical issues he already had at sentencing such as kidney disease, hypertension, sleep apnea and shingles are not alleged in this motion to have worsened, at least not sufficiently to justify compassionate release. And standing alone, there would be no reason these conditions would justify this court ignoring the 30-day requirement of allowing the Bureau of Prisons to consider the prisoner's compassionate release request.

The medical issues related to a possible recurrence of cancer have not been verified with the Bureau of Prisons in the few days since the prisoner filed this motion. But the short answer to any allegation that the prisoner's serious medical needs are being ignored is to order the BOP to take care of them. The prisoner's ability to obtain the quickest follow-up on a possible cancer recurrence is within the prison system, not with a possibly overburdened civilian doctor lacking access to his recent medical records and tests.

Finally, the defendant refers to the Covid-19 issues in seeking compassionate release. The court is well aware of the efforts within the prison system to control and mitigate the effects of the virus. The fact that the virus is in the prison system- and also in the community- does not automatically justify a compassionate release for all prisoners, even those who are older and with medical issues.

The Bureau of Prisons is already evaluating and releasing inmates most at risk from the COVID-19 pandemic. Following two recent directives from the Attorney General, the Bureau of Prisons is urgently assessing its entire prison population to determine which inmates are eligible for home confinement, face the most risk from COVID-19, and pose the least danger to public safety. That process requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. This necessarily requires prioritizing the most pressing cases. Mr. Saad should not be allowed to bypass this process simply by petitioning the Court. The BOP website, accessed today, indicates that1,362 inmates have already been released through its enhanced home confinement program in response to Covid-

19. Allowing the BOP to conduct this process in a fair and uniform manner is far better than allowing individual district court judges to address the issue in a piecemeal fashion.

Mr. Saad does not qualify for compassionate release. Because he admits he has not exhausted his efforts for compassionate release from the Bureau of Prisons based on COVID-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his COVID-19-based argument. Nor do his characteristics qualify him for compassionate release under that statute.

## Argument

**I. Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and prisoner Saad should not be permitted to bypass that process.**

**A. The Bureau of Prisons has new authority to place federal prisoners in home confinement.**

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19, and its authority to do so has now been expanded. Previously, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment . . . or 6 months." *Id.* But new legislation now temporarily

permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. Law 116-136, 134 Stat 281, 516 (Mar. 27, 2020).

In addition, the Attorney General has recently issued two directives to the Bureau of Prisons, making the finding that triggers the increased statutory authority under § 3624(c)(2) and ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1 (attached as Ex. 1); 04-03-2020 Directive to BOP, at 1 (attached as Ex. 2)). The Attorney General's directives remind the Bureau of Prisons to consider "the statutory requirements for home confinement." (03-26-2020 Directive to BOP, at 1). These statutory requirements include the requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders.

The directives also require the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). And the directives instruct the Bureau of Prisons to consider "*all* at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2 (emphasis added)).

In evaluating each inmate under these new directives, the Bureau of Prisons must balance at least four general considerations:

1.) The inmate's age and vulnerability to COVID-19;

2.) Whether home confinement would actually decrease the inmate's risk of contracting COVID-19;

3.) Whether the inmate is at one of the facilities most affected by COVID-19; and

4.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Evaluating the inmate's risk to the public requires assessing not only the inmate's

crime of conviction, but also his criminal history, the resources and security level of his prison facility, his proposed home-confinement location, his disciplinary record in prison, and his risk of recidivism. (03-26-2020 Directive to BOP).

Those criteria make sense. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of prisoners. (04-03-2020 Directive to BOP, at 2–3). That is true in normal times, and it is particularly true given the strain on our medical system right now. The Bureau of Prisons is focused on releasing inmates who are the most vulnerable to COVID-19 and whose release will least endanger public safety.

### B. Even if Saad is eligible for home confinement, he should not be permitted to cut in front of other inmates for consideration by the Bureau of Prisons.

Mr. Saad has the opportunity to be granted home confinement under the new legislation and Attorney General's directives. But he should not be permitted to push his way past other inmates

Further, even if the Bureau of Prisons decides to release Mr. Saad into home confinement, it must first ensure that any home-confinement location is suitable for release, does not place him at an even greater

risk of contracting COVID-19, and does not place members of the public at risk from him. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Although the Bureau of Prisons is expediting that process—particularly at the facilities most affected by COVID-19—it cannot happen overnight.  Every potentially eligible inmate cannot be released simultaneously. The Bureau of Prisons should be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19.

    The Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for discretionary release. Inmates at every institution, including FCI Milan, are being protected by a new [shelter-in-place protocol](#) to decrease the spread of the virus. Even prior to the national lockdown, the Bureau of Prisons had already instituted a number of precautionary measures to reduce the risk of infection. A full run-down of those measures is available on the Bureau of Prisons' COVID-19 Action Plan [website](#).  Although no plan is perfect, these measures will help federal inmates remain protected from COVID-19 and ensure that they receive any required medical care during these difficult times.

## II. The Court should deny Mr. Saad's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. But first, inmates must request compassionate release and exhaust their administrative remedies with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails to act on their request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual inmate's "extraordinary and compelling reasons," which must be consistent with the Sentencing Commission's policy statement and which the inmate has the burden of showing. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Mr. Saad has not exhausted his administrative remedies.

The Court must dismiss Saad's motion because he admits he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Before an inmate moves for compassionate

release in court, he "must ask the Bureau of Prisons[] to do so on [his] behalf, give BOP thirty days to respond, and exhaust any available administrative appeals." *United States v. Raia*, __ F.3d __, No. 20-1033, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020) (summarizing § 3582(c)(1)(A)).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1855–57 (2016). Those requirements may not be excused, even to account for "special circumstances." *Id.* Those requirements also mean that a party may not move for relief in court based on a different ground than the one he raised during the administrative process. *See Hasan v. Ashcroft*, 397 F.3d 417, 419–20 (6th Cir. 2005).

The defendant argues that the statutory requirement is not jurisdictional. That argument is refuted by the cases cited below. And in any event, this Court is not in the practice of ignoring federal statutes, jurisdictional or not, simply because the prisoner finds them inconvenient.

That failure is fatal to this claim. As the Third Circuit explained recently in denying a similar, unexhausted motion for compassionate

release, the COVID-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. *Raia*, __ F.3d __, 2020 WL 1647922, at *2. Rather, "[g]iven Bureau of Prisons's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.*; *see also United States v. Eberhart*, No. 13-CR-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("Because defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief [based on COVID-19] under § 3582(c)(1)(A)(i)."). So Mr. Saad's motion must be denied on that basis alone.

**B. There are no extraordinary and compelling reasons to grant compassionate release.**

Even if Mr. Saad had exhausted his administrative remedies, compassionate release would be improper. The First Step Act did not change the substantive requirement that compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did Congress remove the directive that the Commission, not the judiciary, adopt the policies regarding "what should be considered extraordinary

and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t).

In that sense, the compassionate-release standard mirrors the identically-worded standard for sentence reductions under 18 U.S.C. § 3582(c)(2) based on retroactive guideline amendments. In both contexts, the Sentencing Commission's policy statements place "hard limit[s] on a court's ability to reduce the sentence." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has upheld those limits under § 3582(c)(2), stressing that "Congress charged the Commission with determining in what circumstances and by what amount the sentences of prisoners affected by Guidelines amendments may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). So even when an inmate asks a district court to disregard those limits, the Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to four

categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories, he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at *3; *cf. Dillon*, 560 U.S. at 830.

Mr. Saad relies on his age of 71 years and his medical conditions, but he is not eligible for compassionate release on either basis. The applicable sentencing guidelines and comments, USSG § 1B1.13, with n.1, give four general reasons for compassionate release. (1) The prisoner does not qualify as one with a terminal illness. (2) He does not qualify as one whose conditions prevent him from engaging in self-care at the facility. (3) He does not qualify as someone who is over 65, has serious medical issues, and has served over 75% of his sentence. (4) He does not need to serve as a sole caregiver due to a death in the family.

Nor is Mr. Saad correct in suggesting that the COVID-19 pandemic alters this analysis. The crux of his claim is that he *could* contract COVID-19 and that the virus *could* jeopardize his health. But there is a risk of contracting the disease in prison, and also a risk of contracting

the disease if released to home confinement.  Standing alone, this is not enough to satisfy § 1B1.13's criteria.

Nor is Mr. Saad eligible for compassionate release based on the "other reasons" category. For this category, the Bureau of Prisons has issued [Program Statement 5050.50](), which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Mr. Saad has not shown that he satisfies those standards, and the COVID-19 pandemic does nothing to change that.

Further, because Congress and the Sentencing Commission have mandated that "other reasons" for eligibility be determined by the Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based on the threat posed to prisoner Saad by the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019); *United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov.

21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019).

Even if that judicial authority existed, the COVID-19 pandemic does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, __ F.3d __, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). The Bureau of Prisons has worked around the clock to implement precautionary measures reducing the risk from COVID-19 to Mr. Saad and other inmates. And if COVID-19, standing alone, qualified as an "extraordinary and compelling reason[]" for relief, there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting

COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation.

  C. **The factors set forth in 18 U.S.C. § 3553(a) also do not support relief.**

Even when an inmate is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a). So even if the Court were to find prisoner Saad eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The prisoner cites the threat to public health caused by the pandemic in asking for release. This is ironic, since his own criminal behavior was directly responsible for the illegal release of approximately 1.4 million dosage units of prescription drugs into society- with all of the disastrous consequences for public health that implies. This court must follow the statute and not depreciate the "seriousness of the offense." Imposing a sentence of 33 months for the most culpable person in a 1.4 million dosage pill mill would undermine the seriousness of the offense.

The undersigned and the court will rightfully investigate with the BOP whether the prisoner's possible recurrence of cancer is being appropriately addressed within the prison medical system. This claim should not be accepted just because the prisoner says so. The prisoner also filed a 2255 petition claiming that one of the two AUSAs previously handling the case threatened the defendant's family in order to get him to plead guilty. This was simply false. This cautions the court that the prisoner's claims about his lack of medical care are not automatically true.

## Conclusion

Mr. Saad's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ WAYNE F. PRATT
Assistant United States Attorney
211 West Fort Street, Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: wayne.pratt@usdoj.gov

Dated: April 21, 2020                    Bar No. P32528


## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

                                          s/ WAYNE F. PRATT
                                          Assistant United States Attorney